943 So.2d 471 (2006)
M.D., Wife of/and C.R.W., Individually and as Administrators of the Estate of the Minor Child, K.W.[1]
v.
STATE of Louisiana, the DEPARTMENT OF SOCIAL SERVICES, Office of Community Services of the State of Louisiana and Julianne North.
No. 2005 CA 1044.
Court of Appeal of Louisiana, First Circuit.
September 1, 2006.
*473 Robert S. Toale, Gretna, for Plaintiffs-Appellees M.D., Wife of/and C.R.W., Individually and as Administrators of the Estate of the Minor Child, K.W.
Charles C. Foti, Jr., Attorney General, Nicole M. Duarte, Special Assistant Attorney General, New Orleans, for Defendants-Appellants State of Louisiana, the Department of Social Services, Office of Community Services of the State of Louisiana and Julianne North.
Before: CARTER, C.J., WHIPPLE, KUHN, GUIDRY, and PETTIGREW, JJ.
PETTIGREW, J.
Defendant, State of Louisiana through the Department of Social Services, Office of Community Services ("OCS"), filed the instant appeal from a judgment finding OCS liable to plaintiffs, M.D., wife of/and C.R.W., individually and as administrators of the estate of the minor child, K.W., and awarding plaintiffs damages.
Plaintiffs have answered the appeal alleging that the damages awarded are inadequate and should be increased. They further allege that OCS caseworker, Julianne *474 North, should have also been held liable in the judgment below. For the reasons that follow, we reverse in part, amend in part, affirm as amended, and remand with instructions.

FACTS AND PROCEDURAL HISTORY
On November 12, 1991, OCS assigned caseworker Julianne North to investigate an allegation that K.W. had been the victim of sexual abuse by her father, C.R.W. Following an investigation by OCS, K.W. was separated from her family and placed in the care of her maternal grandparents. By court order dated November 12, 1991, the State of Louisiana, through the Department of Health and Human Resources, was granted temporary custody of K.W. Because of the ongoing investigation and OCS's allegations of sexual abuse by K.W.'s father, M.D. was only allowed supervised visitation with K.W.C.R.W. was denied any contact with his daughter. This scenario continued through July 23, 1992, when K.W. was returned to her parents' home. However, legal custody of K.W. was not returned to her parents until November 6, 1992. OCS officially closed the case on November 30, 1992.
The trial court, in its written reasons for judgment, gave an extensive and well reasoned finding of the facts with regard to this case, which we adopt herein as our own:
The cause of this lawsuit began on November 12, 1991 when [K.W.], the four-year-old daughter of [M.D.] and her husband [C.R.W.,] was brought to the attention of the Office of Community Services of the State of Louisiana (hereafter OCS). [K.W.] had a history of difficulty with bowel movements, and at home she often had to be helped with enemas and even manual extraction for elimination of her feces. Her mother usually took care of [K.W.'s] problems, but when the child began preschool, the teachers occasionally had to help the child with her restroom problems. The teachers' aides reportedly became annoyed on occasion with the additional chore and failed to properly clean the child, so that irritation of [K.W.'s] private parts was not an uncommon event for her mother.
On November 12, 1991, officials at [K.W.'s] school called the St. Tammany Parish Sheriff's Office with the advisory that the child may have been sexually abused. At the school, a teacher's aide informed Sheriff's Detective Grant Ross and Julianne North, a crisis intervention officer of OCS, that [K.W.'s] vaginal area looked "unusual" when she was being assisted in the restroom, that there was blood on her panties, and that the child had said "My daddy hurt me there." [K.W.] also reportedly had stated to the teacher's aide that "her daddy hurt her with his d* *k." At the time, Detective Ross and Ms. North, the social worker, were not informed of [K.W.'s] defecation problems and her phobia over going to the bathroom, resulting from her past difficulties and pain.
. . . [K.W.] was questioned for over thirty minutes by Ross and North, the investigators, without a parent present. When [K.W.] was asked by the two where she was hurt, she reportedly pointed to her posterior. The two investigators did not examine [K.W.] physically, nor did they ask at that time how the "hurt" happened. . . .
[K.W.] was in a special education class, partly for her poor articulation. She was difficult to understand verbally and had problems expressing herself. [K.W.] had also fallen on the school's monkey bars six months previously, and had then injured her perineal area. After *475 the fall, she had bled in her vaginal area. She was treated for her injury by her pediatricians, Dr. Sanders and Dr. Andreica, who also noted her phobia with defecation. According to medical records, [K.W.] had had problems with defecation since 1988, and the injury on the monkey bars seemed to exacerbate her reluctance to visit the toilet. She would often retain her feces for days, exhibiting discomfort but refusing to move her bowels. . . . [M.D. and C.R.W.] were called to the school after the child's interview. They were observed to be pleasant and cooperative but bewildered and shocked by the allegations.
The OCS worker took [K.W.], her mother, and Detective Ross to see Dr. Joan Curtis of the Covington Surgery Center on that same afternoon, November 12, 1991. Doctor Curtis was chosen by OCS. Although no written report was ever made by Dr. Curtis, Ms. North wrote up a report of what she surmised that Dr. Curtis had "said". . . . [K.W.] was traumatized by the examination. Even though she was given a sedative, she would not cooperate. Dr. Curtis nevertheless reportedly found tears on the vagina and ordered a full examination for the next day under complete sedation. The results of that exam [were] also summarized by Ms. North. Ms. North stated that the labia, clitoris, and hymen were "intact" but the "rectum was all torn up, her perineum is torn, and there is severe and acute trauma to the entire perineal area." . . . An undated handwritten report from Dr. Curtis is in the record . . . which appears from the context to have been scribbled on November 12. Those handwritten notes appear to rely heavily on the child's statements of her history, and because of "fissures," Dr. Curtis finds "conclusion for blunt trauma" and recommends contact with the father be terminated.
The mother objected at the time to her child being subjected to sedation as well as examination by strangers, but to no avail.
On November 13, 1991, an Instanter Order was issued, removing [K.W.] from her home and placing her with her grandparents. [C.R.W.] was arrested on November 15, 1991 for aggravated rape of his child. He was later released on bond, and was denied any contact with [K.W.] at all. Because [M.D.] would not admit to OCS that her husband had raped their child, she was allowed only limited and supervised visitation.
The world of the . . . family was completely disrupted. The [family's] two other . . . children were closely interviewed. [M.D.] worked as an LPN, while [C.R.W.] was a truck driver for St. Tammany Parish. Both had their social, economic, and personal lives in turmoil. [M.D.] described it as a "living hell."
A succession of medical doctors and social workers entered the process at this point. Dr. Gerard DiLeo of the Covington Surgery Center participated in another physical examination of [K.W.] under general anesthesia on November 13.1991. He found "a rectal exam revealed the sphincter to be intact and no evidence of hematoma" with no lesions to the hymen. This report is in direct opposition to the one made by Dr. Curtis the day before. Dr. DiLeo's report was not submitted to the Juvenile Court or to the . . . family[,] . . . although caseworker Linda Amos noted that his findings "go against other reports" and he "doesn't believe any sexual abuse occurred." . . .
Dr. Jodie Holloway of Tulane Medical Center wrote an evaluation on January *476 10[,] 1992. He noted [K.W.'s] problems with articulation and expression, and refused to draw any definite conclusions from his brief interview. . . .
On March 31, 1992, Ms. Ginger Pine and Ms. Linda Amos of OCS picked up [K.W.] from school and, without notifying the parents or grandparents, took the child to Kathryn Coffman of Children's Hospital for an examination. Dr. Coffman noted the change in [K.W.'s] story from her father hurting her to stating that her mother hurt her. At that examination, [K.W.] stated that "no one" had ever hurt her and denied that her father had ever touched her private parts. Dr. Coffman noted that there were no signs of any previous severe physical trauma and that a dermatologic condition, which Dr. Curtis had attributed to sexual activity, was "a condition of unknown etiology which is not related to sexual abuse." . . . This is the same conclusion which Dr. Susan McBurney, the dermatologist, had reached when issuing treatment for [K.W.] on May 25, 1992. Therefore, Dr. Coffman found no evidence either supporting or denying sexual abuse.
On May 28, 1992[,] Dr. John Willis . . . examined [K.W.] and noted her on-going treatment . . . for her bowel problems. Dr. Willis found the child to be physically normal and ready developmentally for a normal kindergarten class. . . .
OCS engaged Valerie Turgeon, Ph.D., to evaluate and treat [K.W.] under the Child in Need of Care Act. Dr. Turgeon wrote two lengthy reports: on January 22, 1992 and on May 19, 1992. . . . Dr. Turgeon was frequently hired by OCS to treat allegations of child abuse professionally. The January report gave summaries of interviews with [K.W.] and her mother, at which time [K.W.] made contradictory statements, including that "no one hurt her." Although Dr. Turgeon noted that [K.W.] missed her mother and her home deeply, she wanted to remove [K.W.] from her grandparents' home since they were denying that the abuse had happened. There was obviously a personality conflict between Dr. Turgeon and [M.D.] from the beginning. . . . Despite [M.D.'s] request, OCS refused to appoint the family a more suitable counselor. Dr. Turgeon's May report detailed an evaluation of [C.R.W.], at which he appeared completely cooperative while denying abuse. In this report, Dr. Turgeon recommended family counseling for them all.
The family was seen by Victoria Witt, Ph.D., first on May 19, 1992, and her report indicates that by this time [K.W.] has been returned to live with her family. . . . [C.R.W.] agreed to the counseling once the rape charges against him were dropped by the district attorney and he was allowed supervised visitation in May 1992. Dr. Witt noted that [K.W.] was easily frightened and fearful of being separated from her family. Dr. Witt believed that while sexual abuse could not be completely ruled out, "There is reasonable evidence to suggest the likelihood of other, far more reasonable possibilities which coexisted prior to her complaint." The recommendation is that [K.W.] return to her parents and brothers, where Dr. Witt believed she would be safe. The family continued to receive counseling from Dr. Witt for some time.
The OCS report, written by Linda Amos, to Judge Chaisson of Juvenile Court . . . on July 17, 1992, indicates that [K.W.] is not living in the home, but recommends that she be reunified with her family on July 23, 1992. The recommended reunification was dependent upon cooperation of the family and continued *477 counseling, and was to be unsupervised. . . .
Ms. North's (OCS crisis intervention worker) testimony was certainly interesting. She admitted that while her duty is "to investigate and get all the facts," she did not even consider [M.D.'s] version of the facts since that "was not how she worked." In addition, she was far too rushed to ever consult with Dr. DiLeo about his report that said he believed there was probably no abuse. Ms. North ignored all denials by the family, dismissing them as "hallmarks" of abuse cases. On the witness stand under oath, she did not remember certain important and pertinent facts and admitted errors in the written records, such as wrong dates. She was often confused. She never wrote down the details of her interviews with [C.R.W.]. In fact, she does not remember if she ever spoke to him. She had decided by November 13, 1991 that [K.W.] had been raped by her father. She decided this even before a group meeting at OCS. She stated that working for OCS was the most difficult job she had ever had, and she also admitted to having trouble handling and closing cases. Her memory of events is vague, and apparently Ms. North failed to write many items in her reports. It appears that the volume of work, the pending adjudication of this case, and her imminent transfer became instrumental in her being replaced with Linda Amos. Ms. North asked to be transferred in the spring while the investigation was still being made. . . .
Linda Amos, a social worker since 1989 and with OCS since 1991, also did not appear to remember much about the case even though she was appointed on November 21, 1991 to handle it. She admitted that Dr. Holloway's evaluation entitled "Short-Term Clinic Evaluation" dated January 10, 1992, remarks about [K.W.] that "It was difficult to understand her verbal content. She had definite articulation difficulties and at times it was hard to understand her verbal content." . . . His "Impression" under "Axis III," stated that he "Rule[d] out sexual abuse." . . . Ms. Amos remembers that this report was sent to her and she read it, but she does not remember if she gave it to the Juvenile Court as part of her review. She never spoke to Dr. DiLeo about his report.
On November 13, 1991 OCS refused to allow [M.D.] to take [K.W.] for an examination to a doctor of her choosing or a doctor who had previously treated [K.W.], saying it would be too "traumatic" for the child . . . but OCS had [K.W.] examined . . ., less than a month later, by Dr. Holloway. Since OCS had custody of the child from November 13, 1991, [M.D.] could do nothing.
Although [M.D.] complained about Dr. Turgeon and her preconceptions, she was not allowed to visit with another therapist until May of 1992. At that time, events seem to have speeded toward a conclusion.
The written reports not supporting the OCS beliefs seem to have been omitted from Juvenile Court records and withheld from the plaintiffs' attorney. Ms. Amos selectively does not remember anything that would reflect poorly on her or on OCS. . . . She still maintains that the allegations are "inconclusive," and the fact that the father was unable to see his child until May, and the mother had supervised visitation until July, was appropriate. She thought that [M.D.] was uncooperative because she refused to admit that her husband had sexually abused their child. She held on to this opinion in spite of the fact that the mother had cooperated in every other way. Ms. Amos had no *478 explanation for the fact that in spite of no new information, OCS began allowing the father visitation only when he was willing to stipulate to the child being "in need of care," taking that statement as an admission of guilt. Then the reunification with the family was suddenly made in July 1992 without restrictions. Dr. Witt's report was not made until October 1992, but apparently OCS was no longer worried about [K.W.'s] safety in July, 1992, and relinquished custody completely to the parents. It is only at this trial in 2004 that OCS makes the allegation that enemas may have hurt the child and that therefore the family should be split apart. . . .
[M.D.], an LPN for twenty-five years, testified for her family. Her mother, an R.N., worked as a pediatric nurse at Charity Hospital for thirty-seven years. They were both dealing with [K.W.'s] bowel habits and phobia over defecation, and they had admonished the school workers for not cleaning the child properly after a bowel movement. [K.W.] had returned home from school often with dried feces on [her] bottom and the beginning of irritation on her skin. The monkey-bar incident was appropriately treated by [K.W.'s] regular pediatrician, so when the parents were called to the school on November 12, 1991, they were stunned.
The parents sleep in a 10' × 10' bedroom in a trailer, and there are two other children, so there is very little privacy within the family. [M.D.] was dismayed at the aggressiveness of Detective Ross and Ms. North, and threats of being arrested as an accessory to a crime frightened her enormously. During the hour's interrogation, [M.D.] inquired as to the evidence for the allegation of rape. Ross and North refused to answer. Ms. North was always "in control" with a heavy hand. [M.D.] was forced to hold her child and attempt to sedate her for the physical examination by Dr. Curtis, even though [K.W.] was screaming and fighting, both at the initial exam and the next day. Ross and North entered her home with no consent to search or [a] search warrant. They removed bed linens and underwear.
[M.D.] agreed to allow [K.W.] to be placed at her grandparents' home, as she knew she was helpless to stop her removal and was afraid that she would be placed with strangers. As [a] mildly autistic child, [K.W.] is abnormally sensitive to change and upset.
On November 13, 1991 the mother was forced to once again assist in sedating her child, after following the instructions of not washing or holding her at home. She was required by the instructions of the authorities and Dr. Curtis not to wash the dried bowel excretion off [K.W.]. The child smelled bad and was miserable with this dried material left on her until the examination the next day.
Dr. Curtis would not listen to the mother's recitation of her child's history. But when Dr. DiLeo stated that [K.W.'s] hymen was intact and that there was no evidence of molestation, [M.D.] thought the nightmare was over. In reality, it was just beginning. [C.R.W.] could not even wave to his child on the street, or attend church since [K.W.] would be there. He was placed in the St. Tammany Parish jail and had to post bail for the criminal charges alleged against him. Both [M.D. and C.R.W.] had to answer the most personal questions.
[M.D.] did not like Dr. Turgeon, since the [psychologist] assumed she was lying. The doctor would not make eye contact with her, and she obviously had assumed that the allegations were true and that [M.D.] was protecting her *479 husband. Ms. Amos was indifferent to [M.D.], keeping a cool distance and merely tolerating her. The mother's requests for a different therapist went unheeded until April 1992, when Dr. Witt was approved.
The lines of communication were open between [M.D.] and Dr. Witt, and rapid progress was then made toward the reunification. The [family] continued to see Dr. Witt for two and one-half years, for [K.W.] was traumatized by the separation, as were the parents. The father is still afraid to touch his child, and they feel "watched" and "threatened" by strangers. Although now sixteen years old, [K.W.] is better, but some of the pain, depression, and anger persist. . . . It was only after [M.D. and C.R.W.] were willing to stipulate, upon the advice of their counsel, that the child "was in need of care" that [K.W.] regained visitation with her family. They knew that this was the only way they would get their child back.
[C.R.W.], [K.W.'s] father, testified that Detective Ross and Ms. North interviewed him at the time of the incident, accusing him and saying that [K.W.] had alleged he "hurt" her. He denied it, and told them of her bowel problems. He testified that the unwarranted search of their trailer was "humiliating" and he was angry and confused. He was fearful that the other children would be taken away as well, and felt helpless to fight the charges.
. . . .
Ginger Pine, a supervisor with OCS, was questioned closely but could add little to the testimony for she was not directly involved with the case. She admitted an inability to explain what had happened, but she made new allegations of obsession of the parents with bowel movements, neglect of the parents in caring for the child, problems of the child with "equilibrium," and "poor parenting" by the use of enemas. She was unable to support the reasons why these new problems were a basis for removing the child from the home and denying her parental affection. Although she supported Dr. Curtis's verbal reports wholeheartedly, she did note that Dr. Coffman found no evidence of sexual abuse, but instead theorized that a hard stool could have caused the initial problem. . . . She adhered to the OCS line that she still believed that sexual abuse occurred, but she had no explanation why, if she so believed, that the child would have been returned to the parents with no restrictions except that the father was receiving treatment. . . .
. . . .
This Court finds that the plaintiffs have proved their case by a preponderance of the evidence, and awards damages against the Office of Community Services. Ms. North is not personally liable, as she was acting as an employee of the organization. Plaintiffs are to be reimbursed for their fees to Dr. Victoria Witt from July 17, 1992 to the end of their treatment and for all legal fees they incurred as a result of defending themselves against OCS taking their child and the criminal case resulting from OCS's allegations. They are also to be awarded general damages in the amount of seventy-five thousand dollars ($75,000.00) for their mental pain and suffering.
The trial court signed a judgment in accordance with its findings on December 7, 2004, personally dismissing Ms. North, with prejudice, and ordering as follows:
[OCS] is found at fault, and furthermore acted arbitrarily and capriciously in its capacity in removing the minor child from her household, and is liable for *480 general damages in the amount of $75,000.00, all legal fees incurred by the plaintiffs in the criminal matter, and for all counseling fees to Dr. Victoria Witt from July 17, 1992 to the end of the child's treatment, plus legal interest from date of filing.
It is from this judgment that OCS filed the instant appeal, assigning the following specifications of error:
1. The trial court erred and/or manifestly erred in holding the OCS liable for wrongfully removing and retaining the plaintiffs' child from their home.
2. Even if the liability determination could be upheld, the trial court's award of attorney's fees to compensate the plaintiffs for the amounts they expended to defend plaintiff [C.R.W.] in the criminal prosecution filed by the district attorney against him and to represent the [family's] interests in the Child in Need of Care proceeding must be set aside, and the court's award of general damages should be reduced.
Plaintiffs answered the appeal, setting forth the following assignments of error for our review:
1. The trial court erred in failing to award any sums for legally compensable elements of damages proven at trial, including loss of consortium, loss of enjoyment of life and interference with custody, mandating an increase in general damages.
2. The trial court abused its discretion in only awarding $75,000.00 for mental pain and suffering, mandating an increase in general damages.
3. The trial court erred in failing to specify the amount of special damages in the judgment, requiring correction by this court.
4. The trial court erred in omitting to cast defendants with costs in the judgment, requiring correction by this court.
5. The trial court erred in failing to hold defendant Julianne North liable in her official capacity in the judgment, requiring clarification by this court.

STATUTORY IMMUNITY
In Todd v. State Through Dept. of Social Services, Office of Community Services, 96-3090, p. 8 (La.9/9/97), 699 So.2d 35, 39, the Louisiana Supreme Court held that the duty of a child protection caseworker and OCS is delineated by La. Ch. C. arts. 611 and 612, and by La. R.S. 9:2798.1. These statutes provide, in pertinent part, as follows:
Art. 611. Immunity from civil or criminal liability
A. (1) No cause of action shall exist against any:
(a) Person who in good faith makes a report, cooperates in any investigation arising as a result of such report, or participates in judicial proceedings authorized under the provisions of this Chapter.
(b) Caseworker who in good faith conducts an investigation, makes an investigative judgment or disposition, or releases or uses information contained in the central registry for the purpose of protecting a child.
(2) Such individuals shall have immunity from civil or criminal liability that otherwise might be incurred or imposed.
B. This immunity shall not be extended to:
(1) Any alleged principal, conspirator, or accessory to an offense involving the abuse or neglect of the child.
(2) Any person who makes a report known to be false or with reckless disregard for the truth of the report.
*481 Art. 612. Assignment of reports for investigation and assessment
. . . .
G. The Department of Social Services shall set priorities for case response and allocate staff resources to cases identified by reporters as presenting immediate substantial risk of harm to children. Absent evidence of willful or intentional misconduct or gross negligence in carrying out the investigative functions of the state child protection program, caseworkers, supervisors, program managers, and agency heads shall be immune from civil and criminal liability in any legal action arising from the department's decisions made relative to the setting of priorities for cases and targeting of staff resources. (Emphasis added.)
La. R.S. 9:2798.1. Policymaking or discretionary acts or omissions of public entities or their officers or employees
. . . .
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
Thus, although OCS and its employees may be entitled to the qualified immunity set forth in La. Ch. C. arts. 611 and 612 and La. R.S. 9:2798.1, there is no such immunity if gross negligence is alleged and proven.
In Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, 93-3110, 93-3112, pp. 5-6 (La.7/5/94), 639 So.2d 216, 219-220, the supreme court addressed the concept of gross negligence as follows:
Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." "There is often no clear distinction between such [willful, wanton, or reckless] conduct and `gross' negligence, and the two have tended to merge and take on the same meaning." Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence. (Citations omitted.)
On appeal, OCS argues the record does not clearly demonstrate the trial court applied the proper standard of liability under La. R.S. 9:2798.1 in determining the liability of OCS. Thus, OCS maintains, the trial court committed legal error such that the normally applicable manifest error/clearly wrong standard of review is inapplicable, and this court should conduct a de novo review of the trial court's findings and conclusions. We find no merit to this argument.
It is well settled that the appellate court's review of factual findings is governed by the manifest error-clearly *482 wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary to conclude there was manifest error. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. Stobart v. State of Louisiana, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Furthermore, when factual findings are based on the credibility of witnesses, the fact finder's decision to credit a witness's testimony must be given "great deference" by the appellate court. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart, 617 So.2d at 882. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the trial court's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541, 97-0577, p. 7 (La.2/6/98), 708 So.2d 731, 735. If, however, the trial court does make an error of law but such error does not interdict the court's fact finding, de novo review is not warranted. David v. Thibodeaux, XXXX-XXXX, p. 7 n. 4 (La.App. 1 Cir. 5/11/05), 916 So.2d 214, 219 n. 4, writ denied, XXXX-XXXX (La.1/27/06), 922 So.2d 545.
In the instant case, after considering the evidence and the applicable law, the trial court found liability on the part of OCS, noting as follows:
This Court finds that the actions of OCS were far beyond diligent, and in fact stepped over into [harassment]. The allegations certainly demanded an investigation, and a physical examination of the child, but the roughness and insensitivity to the child's feelings was certainly unnecessary as she was manhandled and sedated. Dr. [Curtis's] report may have called for removal to the grandparents' home for a day or two, but Dr. DiLeo's opinion should have been considered as well, since his report of November 13, 1991 was contrary to that of Dr. Curtis. Also, the child's slowness in mental development and difficulty in articulation should have been weighed, as well as the fact that she was only four years old. From November 13, 1991, OCS should have been on notice that there was not a certainty that the child was abused, and should have proceeded with care. Instead, the child and the parents have suffered a trauma that will probably stay with them for the rest of their lives. OCS acted in an arbitrary and capricious manner in removing the child from her home for nine months, and acted in bad faith then and now in refusing to entertain the credible evidence against its position. The OCS *483 workers were guilty of gross negligence in their repeated examinations of the child without parental presence or even parental notification, and in their insistence upon following the worst possible course for a sensitive and largely incoherent child. Their refusal to allow the parents to use their own physician or psychologist was unwarranted and cruel.
While it is true that the trial court used terms such as "arbitrary and capricious," "far beyond diligent," "bad faith," "harassment," and "unwarranted and cruel," in describing the actions of OCS and its employees, this does not equate with legal error by the trial court. Thus, the applicable standard of review in this case is the manifest error-clearly wrong standard.
It is evident from a reading of the trial court's extensive reasons for judgment that it carefully considered all of the evidence in the record before finding that plaintiffs met their burden of proving that OCS and its employees committed gross negligence in handling this case. The trial court specifically found that none of OCS's witnesses were credible or believable and that the witnesses' testimony appeared to be rehearsed. To the contrary, the court found both M.D. and C.R.W. to be "completely credible witnesses." We agree. The nature of the allegations against C.R.W. certainly warranted an investigation by OCS. However, the actions taken by OCS and its employees throughout this ordeal went beyond that which was necessary and exhibited their refusal to entertain any credible evidence that the alleged sexual abuse had not occurred.
Following an exhaustive review of the record, including the numerous reports that outline, in detail, OCS's involvement with this case, we find that the trial court's conclusions concerning OCS's liability are reasonable and that its findings are not manifestly erroneous. Although this court may have reached a different conclusion, deference must be accorded to the trial court's findings of fact. Thus, we may not disturb the trial court's findings in this regard. However, our inquiry regarding liability does not end here.
In their petition for damages, plaintiffs named Ms. North personally as a defendant in her capacity as an agent and employee of OCS. Plaintiffs alleged that OCS was responsible to them for the damages occasioned by the acts and/or omissions of Ms. North under the doctrine of respondeat superior. Thus, plaintiffs asserted, OCS and Ms. North were liable, jointly and solidarily, for their damages.
In answering the instant appeal, plaintiffs argue that the trial court erred in failing to hold Ms. North liable in her official capacity as an OCS employee. Plaintiffs maintain the trial court "found that OCS was liable for Ms. North's conduct, and that was the intent of its Judgment." Citing Smith v. Our Lady of the Lake Hospital, 96-1837 (La.9/27/96), 680 So.2d 1163, plaintiffs assert that in the absence of liability on the part of the State's employees, the State cannot be held vicariously liable for the employees' actions. Thus, plaintiffs maintain, the judgment below must be amended to clarify Ms. North's liability. We agree. Therefore, we reverse that portion of the judgment that personally dismissed, with prejudice, Ms. North from this case and amend the judgment accordingly to reflect Ms. North's liability.

DAMAGES
On appeal, OCS attacks the trial court's $75,000.00 general damage award as abusively high. In brief, OCS sets forth the following reasons in support of its contention that the general damage award should be reduced:

*484 (1) the importance of the policy interests involved; (2) . . . OCS's retention of custody was temporary, lasting a matter of months; (3) [M.D.] exercised visitation with [K.W.] throughout the period of OCS custody when [K.W.] was living nearby with family relatives; (4) [C.R.W.] was without visitation for a period of only five months; and (5) [K.W.'s] temporary removal from the family home did not result in any permanent damage to [K.W.], who was only four years old at the time OCS removed her from the home, and her family.
On the other hand, plaintiffs assert the trial court erred in failing to award damages for several compensable elements of damages proven at trial, including loss of consortium, loss of enjoyment of life, and interference with custody. Plaintiffs contend the $75,000.00 awarded in general damages is abusively low and must be increased. Further, plaintiffs assign error to the trial court's failure to specify the amount of special damages awarded to plaintiffs for the counseling fees paid to Dr. Victoria Witt from July 1992 to the end of K.W.'s treatment.
The discretion vested in the trier of fact in fashioning an award of general damages is great, and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Millican v. Ponds, 99-1052, p. 6 (La.App. 1 Cir. 6/23/00), 762 So.2d 1188, 1192.
Based on our review of the evidence before us, we find no abuse of discretion by the trial court in its $75,000.00 general damage award. Given the "particular injuries and their effects under the particular circumstances" in the instant case, the trial court's general damage award sufficiently compensates plaintiffs. See Youn, 623 So.2d at 1260. Thus, we find no merit to the arguments concerning the trial court's general damage award and decline to disturb same. With regard to Dr. Witt's counseling fees, the record reflects that K.W. was treated by Dr. Witt from July 1992 through January 1995, with charges totaling $3,585.00. Thus, we amend the judgment accordingly to specify this amount as special damages awarded to plaintiffs.

AWARD OF ATTORNEY FEES
In addition to challenging the trial court's general damage award, OCS argues the trial court erred in awarding $15,000.00 in attorney fees. OCS maintains that attorney fees can only be awarded if specifically provided for by a contract or statute. OCS asserts that neither the Children's Code nor any other statutes provides for an award of attorney fees on the facts of this case. Thus, OCS contends, the award of attorney fees must be reversed and set aside.[2] To the contrary, *485 plaintiffs argue that the attorney fees they incurred in the underlying criminal proceeding and OCS case should be recoverable as any other expense necessitated by OCS's fault.
At the outset, we find no legal basis for an award of attorney fees associated with the underlying criminal matter. However, with regard to the legal fees associated with defending the OCS matter, we find plaintiffs are entitled to recover same as special damages as these expenses were necessitated by the gross negligence of OCS and its employees. According to the record, plaintiffs paid $15,000.00 in legal fees for representation in both the criminal matter and the OCS case. Unfortunately, we are unable to discern from the record what portion of these fees was attributable to defending the OCS case. Therefore, we remand the matter to the trial court for the purpose of determining an appropriate amount of attorney fees to be awarded to plaintiffs as "legal fees incurred by plaintiffs in defending the OCS case."

COURT COSTS
The final issue for our consideration is whether the trial court erred in failing to cast defendants with costs in the judgment below. Plaintiffs argue that as the prevailing parties, they are entitled to costs. OCS maintains that pursuant to La. R.S. 13:5112, the trial court may, but is not required to, award costs against a State entity such as OCS. Thus, OCS contends, plaintiffs are not entitled to an award of costs. We find merit to plaintiffs' argument on this issue.
Louisiana Revised Statutes 13:5112 provides, in pertinent part, as follows with regard to the award of costs against a State entity:
A. In any suit against the state or any department, board, commission, agency, or political subdivision thereof, the trial or appellate court, after taking into account any equitable considerations as it would under Article 1920 or Article 2164 of the Code of Civil Procedure, as applicable, may grant in favor of the successful party and against the state, department, board, commission, agency, or political subdivision against which judgment is rendered, an award of such successful party's court costs under R.S. 13:4533 and other applicable law as the court deems proper but, if awarded, shall express such costs in a dollar amount in a judgment of the trial court or decree of the appellate court.
Based on the unique facts and circumstances herein, and considering the grossly negligent actions by OCS and its employees in the handling of this investigation, we conclude plaintiffs are entitled to recover court costs below. Thus, we remand this matter to the trial court for assessment of court costs in a dollar amount as is required by La. R.S. 13:5112. See Gordon v. Louisiana State Bd. of Nursing, XXXX-XXXX, pp. 10-11 (La.App. 1 Cir. 6/22/01), 804 So.2d 34, 40-41, writ denied, 2001-2130 (La.11/16/01), 802 So.2d 607.

CONCLUSION
For the above and foregoing reasons, we reverse that portion of the judgment that *486 personally dismissed Julianne North as a defendant and amend the judgment to reflect that Julianne North, as well as the State of Louisiana through the Department of Social Services, Office of Community Services, acted with gross negligence and are liable to plaintiffs for general damages in the amount of $75,000.00 and special damages in the amount of $3,585.00 for Dr. Victoria Witt's counseling fees. We remand the matter to the trial court for the purpose of determining an appropriate amount of attorney fees to be awarded to plaintiffs as "legal fees incurred by plaintiffs in defending the OCS case" and for assessment of court costs against the State of Louisiana through the Department of Social Services, Office of Community Services, in a dollar amount as is required by La. R.S. 13:5112. Appeal costs in the amount of $156.25 are assessed against the State of Louisiana through the Department of Social Services, Office of Community Services, and Julianne North.
REVERSED IN PART; AMENDED IN PART, AND AS AMENDED, AFFIRMED; REMANDED WITH INSTRUCTIONS.
KUHN, J., dissents and assigns reasons.
GUIDRY, J., dissents and adopts the reasons assigned by KUHN, J.
KUHN, J., dissenting.
The majority correctly points out that in order to find OCS liable, plaintiffs had to present evidence that the state agency engaged in willful or intentional misconduct or gross negligence, but then disregards this standard by affirming the trial court's award of damages. In this case, the evidence in the record simply does not demonstrate the agency or its employees engaged in willful or intentional misconduct or acted grossly negligent, i.e., "without the want of even slight care and diligence" or "with utter disregard for the dictates of prudence, amounting to complete neglect of the rights of others." See Ambrose v. New Orleans Police Dep't Ambulance Srvc., 93-3099, pp. 5-6 (La.7/5/94), 639 So.2d 216, 219-20.
The trial court's reasons for judgment, which the majority quotes quite liberally, mischaracterize the actions of OCS and its employees. Of particular concern is the trial court's finding that "[Ms. North] was far too rushed to ever consult with Dr. DiLeo about his report that said he believed there was probably no abuse." But after reviewing Dr. DiLeo's November 13, 1991 report, no comments can be found by him whatsoever addressing whether abuse occurred. His specific finding is "there was superficial tearing (primary laceration) of the interior fourchet extending into the perineal region." Thus, he confirmed the pre-op diagnosis of "Trauma to perineum" after completion of the procedure.
Another example of the inaccuracy of the trial court's findings in its reasons for judgment is its statements, "[Dr. DiLeo's November 13, 1991] report [was] buried in the OCS files. It was not available to the Court or to the Williams' attorneys. That report . . . did not come to light until this trial." A review of the record shows that at the commencement of trial, plaintiffs' counsel stated, "The plaintiffs and the defendants have agreed to at least initially two joint exhibits. They have been marked as Exhibit Joint One and Joint Two. . . . These exhibits contain numerous documents, including doctor[s'] reports." Dr. DiLeo's November 13, 1991 report was contained in both joint exhibits. Thus, the record fails to support a finding that Dr. DiLeo's report had been withheld or otherwise been unavailable to plaintiffs.
Additionally, a review of the record shows that subsequent to OCS's involvement stemming from the allegations *487 against Mr. Williams, on two separate occasions and in the presence of their attorney, plaintiffs stipulated that the child was a child in need of care. Moreover, the record establishes that once an OCS-approved psychologist concluded that it was in the child's best interest to be with her parents and brothers, which apparently coincided in time with the district attorney's dismissal of the criminal charge of aggravated rape of his daughter against Mr. Williams, OCS returned the child to the parents, although it continuing to monitor her progress. At the one-year review, OCS closed its file.
The legislature's imposition of a burden of proof which requires plaintiffs to establish that OCS engaged in willful or intentional misconduct or gross negligence and its grant of immunity to the agency correspond to an obvious point: in the exercise of its legal authority the agency must always weigh the protection of the child against parental interests. In this case, the majority's reversion to what appears to be the proof of plaintiffs' case by a preponderance of the evidence certainly will chill the decisions of OCS workers in their assessments of children's needs and protection. With criminal charges pending against the father, would the majority agree that OCS would have been grossly negligent had it closed its file if the charges had later been proven true? Second guessing by the trial court and the majority may bring about results that, though unintended, pose extreme danger for child protection.
I additionally point out that the majority's amendment of the judgment to cast Ms. North in her personal capacity serves no useful purpose. Ms. North is immune from liability pursuant to La. R.S. 9:2798.1 B. Nothing in the record demonstrates that her actions in handling this matter were criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct so as to exempt her or her employer from immunity.
Plaintiffs have failed to establish that OCS and North's actions amounted to "an extreme departure from ordinary care or the want of even scant care." Although OCS and North certainly were careless and misguided, because their actions do not rise to the level of gross negligence or to criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct, I believe the imposition of liability is legal error and, accordingly, I dissent.
NOTES
[1] In the interests of privacy, we have used the initials of the parties involved in this matter. See Uniform RulesCourts of Appeal, Rules 5-1 and 5-2.
[2] We note a discrepancy between the trial court's November 30, 2004 written reasons for judgment and the December 7, 2004 judgment. When addressing the award of attorney fees, the trial court's written reasons refer to "all legal fees [plaintiffs] incurred as a result of defending themselves against OCS taking their child and the criminal case resulting from OCS's allegations." However, in the December 7, 2004 judgment, the trial court referenced only the legal fees incurred by plaintiffs in the criminal matter. Where there is a conflict between the judgment and the written reasons, the judgment controls. Delahoussaye v. Board of Sup'rs of Community and Technical Colleges, XXXX-XXXX, p. 13 (La. App. 1 Cir. 3/24/05), 906 So.2d 646, 654. Thus, we must treat the award of attorney fees as though it was rendered solely for the legal fees associated with the underlying criminal matter.