DANIEL E. MILLICAN
v.
COREGIS INSURANCE COMPANY, EAST BATON ROUGE PARISH SCHOOL BOARD AND VIRGINIA B. WOMACK.
No. 2006 CA 1270.
Court of Appeal of Louisiana, First Circuit.
December 21, 2007.
NOT DESIGNATED FOR PUBLICATION.
RALPH L. FLETCHER, Counsel for Plaintiff/Appellant, Daniel E. Millican.
HAROLD J. ADKINS, DOUGLAS K. FOSTER, SANETTRIA R. GLASPER, Counsel for Defendants/Appellees, Coregis Insurance Company, East Baton Rouge Parish School Board and Virginia B. Womack.
Before PARRO, GUIDRY, AND McCLENDON, JJ.
McCLENDON, J.
Plaintiff appeals a judgment following a jury verdict in favor of the defendants, finding that the plaintiff was not injured as a result of an accident between his pickup truck and a school bus. For the reasons that follow, we vacate and render.

FACTS AND PROCEDURAL HISTORY
On May 5, 2003, Daniel E. Millican filed a petition for damages against Coregis Insurance Company, East Baton Rouge Parish School Board, and Virginia B. Womack.[1] In his petition, Millican asserted that on October 28, 2002, he was driving his Toyota Tacoma pickup truck northbound on Greenwell Springs Road in Baton Rouge, Louisiana, when he came upon the scene of an overturned log truck, which resulted in the blocking of all lanes on Greenwell Springs Road. While stopped, Millican observed an East Baton Rouge Parish school bus, driven by Womack, pull over into the oncoming lane of traffic and pass Millican's vehicle. Womack backed the school bus into a private lot to turn around and, as she pulled out, Millican saw that the school bus was going to strike his truck. In an attempt to avoid a collision, Millican tried to reverse his pickup truck, but the school bus collided with Millican's vehicle.[2] As a result of the accident, Millican alleged that he suffered severe personal injuries. Defendants answered the petition, generally denying his allegations. Following a jury trial on the merits on November 2, 3, and 4, 2005, the twelve-member jury rendered a verdict in favor of the defendants by a vote of nine to three.[3] Judgment was signed on November 28, 2005, dismissing Millican's claims with prejudice at his costs.[4]
Thereafter, Millican filed a motion for judgment notwithstanding the verdict (JNOV), asserting that the defendants stipulated in the pre-trial order that an accident had occurred, that the defendants judicially confessed in their answer that an accident had occurred, that the medical testimony established that it was more probable than not that his injuries were the result of the trauma suffered in the subject bus accident, and that the defendants presented no evidence that he was injured in any other manner than the school bus accident. Therefore, according to Millican, the jury verdict was not supported by the evidence, resulting in a miscarriage of justice and entitling him to a JNOV. Following a hearing on February 13, 2006, the motion was denied, and the judgment was signed on March 16, 2006.

ASSIGNMENTS OF ERROR
Millican has appealed the November 28, 2005 judgment, assigning the following as error:
1. The trial court erred in allowing defense counsel to deviate from the stipulations in the pre-trial order and to raise a completely new defense at trial by presenting to the jury that no accident had happened, even though the pre-trial order stipulated that an accident had indeed happened between plaintiff/appellant' s pickup truck and defendant's school bus.
2. The trial court erred in refusing to allow plaintiff/appellant to publish to the jury the stipulation in the pre-trial order that an accident had happened between plaintiff/appellant's pickup truck and defendant's school bus.
3. The trial court erred in refusing to allow plaintiff/appellant to cross examine defendant Virginia B. Womack on her answers to interrogatories.
4. The trial court erred in refusing to allow plaintiff/appellant to introduce into evidence the accident report prepared by the Louisiana State Police, even though both parties had listed it as an exhibit in their pre-trial order and even though defendant Virginia B. Womack attached it to her answers to interrogatories in response to Interrogatory Number 5 as to how the accident happened.
5. The jury erred in finding that plaintiff/appellant was not injured in an accident, when all treating physicians and defendants' IME expert stated in their respective opinions that plaintiff/appellant was injured in the accident, and there was no evidence whatsoever to the contrary presented by the defendants.
6. The trial court erred in refusing to enforce sanctions against defendants' attorney and/or requiring defendants' attorney to pay reasonable expenses for his disobeying the pre-trial order as required by LSA-C.C.P. art. 1551.

DISCUSSION

The Pre-trial Order
In his initial assignment of error, Millican asserts that the trial court erred in allowing defendants to deviate from the pre-trial order. Millican asserts that on the morning of trial, the defendants for the first time raised a completely new affirmative defense to the matter, that is, that an accident did not occur. According to Millican, the proposed verdict form presented by the defendants on the morning of trial had as its first question whether an accident had occurred.[5] Also, on the morning of trial, the video deposition of defense expert Dr. Allen Joseph was taken, wherein Dr. Joseph was asked to assume that no accident had occurred. In light of these two developments, counsel for Millican raised an objection to this new defense, asserting it was in violation of the pre-trial order and that it prejudiced the plaintiff.
The pre-trial order, in all its amended forms, set forth as an established fact:
That a motor vehicle accident occurred on October 28, 2002 involving a 1999 Toyota Tacoma pickup truck operated by plaintiff, Daniel E. Millican and a 1998 GMC school bus operated by Virginia B. Womack, while in the course and scope of her employment with the East Baton Rouge Parish School Board.
Millican objected to any reference during trial that an accident did not occur. In response to the objection, the defendants' attorney, who had only shortly before taken over the case from his former associate, stated that the issue of liability was never agreed upon and orally moved to amend the pretrial order. The trial court then asked counsel for Millican what his position would be if the amendment was allowed. Counsel replied:
I am not prepared to continue the trial. This has been continued three times. And this case occurred three years ago. This pretrial order was entered into March 1, 2004. There was an established fact that an accident happened. This is not a stipulation of liability. I understand that. I'm not holding him to a stipulation of liability. I'm simply holding him to the established fact.
Thereafter, the trial court denied the defendants' motion to amend the pretrial order, stating that the parties were bound by the court's order.
Millican asserts that although the motion to amend the pre-trial order was denied, the trial court, nevertheless, allowed defendants to deviate from the order and argue that an accident never occurred, clearly evidenced by what followed thereafter. Once the motion to amend the pre-trial order was denied, counsel for the defendants stated again that they never entered into a stipulation as to liability. Millican's attorney replied:
Your Honor, once again, I'll repeat. I'm not asking for a stipulation of liability. I'm simply asking that [defendants' counsel] not be able to change the pretrial order and today tell the jury that we are going to prove an accident didn't happen. Because that's [in] direct contradiction of the established facts from the original attorney. That's why we had the pretrial conference. . . . And my first indication that they were going to deviate from something that had already been established was yesterday when they handed Your Honor a revised verdict form that had been faxed to my office that I got to see this morning, a revised verdict form showing did an accident even happen. So now it's forcing my client to jump through two hoops. Did an accident happen, and was he injured. And I think it's prejudicial. Especially in the middle of the trial coming up with a new strategy and denying what is written and is in the pretrial order.
The defendants' attorney replied that he never indicated that he was not going to contest that an accident happened. Further, despite having refused to allow a last minute amendment to the pre-trial order, the court stated it was not restricting anyone's testimony, nor was it restricting opening statements. At the same time, the trial court recognized that Millican had "the right to rely on the statement that an accident occurred."
In the opening statement of the defendants, counsel called the case one of credibility, in that it would be the testimony of the bus driver, now retired, who had driven for the school board for fourteen years, versus that of the plaintiff. Counsel argued that Womack's credibility was being called into question and repeatedly argued that the theme of the case was credibility. Defense counsel told the jury that Womack was going to testify that an accident did not happen and that they would have to decide if there was an accident.
At the outset of the second day of trial testimony, Millican's attorney brought the trial court's attention to certain law and jurisprudence regarding pre-trial orders, requested that the pre-trial order's established fact that an accident occurred be published to the jury, and also requested sanctions.[6] The defendants' attorney opposed the request, stating that liability was clearly an issue and that the pre-trial order was ambiguous. Counsel for Millican replied:
Your Honor, there is no ambiguity. We are arguing the difference between a fact and a question of law. We are just simply asking that that question of fact that's agreed to be read to the jury. We are not saying that Ms. Womack is liable. This is not an issue of admission of liability. It is just simply stating that a wreck or accident happened between two vehicles. Now, if she wants to say, Daniel hit me, that's fine. This is not restraining them from the contested issues of law contesting liability. I am not asking that they give up their defense on liability. I am asking that they give up the defense on the fact that an accident happened, a collision between two vehicles.
The trial court denied the request to read the pre-trial order to the jury and denied the request for sanctions. Millican's attorney then asked the court if he was able to argue in his closing statement that there was an agreement that an accident occurred. The trial court replied:
See, I think the problem I have with that then is I think we start to get into ancillary arguments. If I allow you to do that, I have to allow him to go into ancillary things that are outside of their presence, outside of their purview. For instance, discovery. In other words, you are going to get up essentially and say, hey, those guys made a giant mistake by stipulating to this because now they have changed their minds. He is going to come back and say, this is really an ambiguous document, and if [Millican's counsel] was doing his job, he would have propounded the right discovery questions to us and we would have answered them. All issues that are really not before them. What essentially is before them is going to be the witnesses that they heard on the witness stand, the depositions, that is what they are going to be asked to make this decision on and the law that applies. I just don't want to bog this thing down on things that I think are not relevant, and I think that takes it out of what has been presented to the jury, and out of things that they are really in a position to understand. So, for those reasons, I don't want to  I am not going to restrict you to argue with regard to the contradictions you feel that may have been present in Ms. Womack's testimony with regard to the denial of an accident, but I am not going to allow you to get up and argue that the defense has already admitted that an accident occurred, and therefore, jury, you should not even consider anything that was presented by the defense, which contradicts the fact that an accident has occurred because they have already agreed to it. I'm not going to let you do that. (Emphasis added.)
Thus, Millican argues, the trial court committed reversible error in allowing the defendants to ignore the stipulations of the pre-trial order, which resulted in substantial prejudice to the plaintiff.
Louisiana Code of Civil Procedure article 1551 provides:
A. In any civil action in a district court the court may in its discretion direct the attorneys for the parties to appear before it for conferences to consider any of the following:
(1) The simplification of the issues, including the elimination of frivolous claims or defenses.
(2) The necessity or desirability of amendments to the pleadings.
(3) What material facts and issues exist without substantial controversy, and what material facts and issues are actually and in good faith controverted.
(4) Proof, stipulations regarding the authenticity of documents, and advance rulings from the court on the admissibility of evidence.
(5) Limitations or restrictions on or regulation of the use of expert testimony under Louisiana Code of Evidence Article 702.
(6) The control and scheduling of discovery.
(7) The identification of witnesses, documents, and exhibits.
(8) Such other matters as may aid in the disposition of the action.
B. The court shall render an order which recites the action taken at the conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel. Such order controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice. (Emphasis added.)
C. If a party's attorney fails to obey a pretrial order, or to appear at the pretrial and scheduling conference, or is substantially unprepared to participate in the conference or fails to participate in good faith, the court, on its own motion or on the motion of a party, after hearing, may make such orders as are just, including orders provided in Article 1471 (2), (3), and (4). In lieu of or in addition to any other sanction, the court may require the party or the attorney representing the party or both to pay the reasonable expenses incurred by noncompliance with this Paragraph, including attorney fees.
The trial court has much discretion in conducting a trial and is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. The theories inherent in the pre-trial procedure, to avoid surprise and allow orderly disposition of the case, constitute sufficient reasons for allowing the trial court to require adherence to the pre-trial order. Highlands Underwriters Insurance Co. v. Foley, 96-1018, p. 5 (La.App. 1 Cir. 3/27/97), 691 So.2d 1336, 1339. The pre-trial order controls the subsequent course of action, but it can be modified at trial to prevent manifest injustice. LSA-C.C.P. art. 1551. Although the trial court is vested with much discretion to amend its pre-trial order, this discretion must be exercised to prevent substantial injustice to the parties who have relied on the pre-trial rulings and structured the preparation and presentation of their cases accordingly. Grayson v. R.B. Ammon and Associates, Inc., 99-2597, p. 9 (La.App. 1 Cir. 11/3/00), 778 So.2d 1, 10, writs denied, 00-3270 and 00-3311 (La. 1/26/01), 782 So.2d 1026 and 1027. Only upon a showing of an abuse of that discretion should the appellate court intervene. Southern Casing of Louisiana, Inc. v. Houma Avionics, Inc., 00-1930, p. 24 (La.App. 1 Cir. 9/28/01), 809 So.2d 1040, 1055.
While we recognize the great discretion of the trial court in allowing an amendment to the pre-trial order, the trial court in this case refused to allow the amendment, denying the defendants' motion to amend and telling the parties that they were bound by the pre-trial order. Yet, the trial court subsequently allowed the defendants to raise the issue before the jury of whether an accident happened, despite the established fact of the pre-trial order that an accident had occurred. Further, the first question on the amended verdict form submitted to the jury, which asked whether Millican was injured in an accident rather than the accident, combined the issues of the occurrence of an accident and the cause of plaintiff's injuries, making it impossible to determine whether the jury denied recovery based on Millican's failure to establish the occurrence of an accident or failure to establish a causal connection between the accident and Millican's injuries. The trial court did not restrict opening statements of counsel, allowing the issue of whether an accident occurred to be raised before the jury and allowing the defendants to argue that an accident had not occurred. Additionally, the trial court denied Millican's request to publish to the jury the pre-trial order's established fact that an accident occurred and refused to restrict closing arguments regarding this issue.
Normally, a factual finding by a jury cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La. 1993). However, where legal error interdicts the fact finding process, the manifest error standard no longer applies and, if the record is complete, an appellate court should make its own de novo review of the record. Lam ex rel. Lam v. State Farm Mut. Auto. Ins. Co., 05-1139, p. 3 (La. 11/29/06), 946 So.2d 133, 135. Thus, any alleged evidentiary errors must be addressed first on appeal, inasmuch as a finding of error may affect the applicable standard of review. Wright v. Bennett, 04-1944, p. 6 (La.App. 1 Cir. 9/28/05), 924 So.2d 178, 182.
A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. When such a prejudicial error of law skews the fact finder's finding of a material issue of fact and causes it to pretermit other issues, the appellate court is required, if it can, to render judgment on the record by applying the correct law and determining the essential material facts de novo. Evans v. Lungrin, 97-0541, 97-0577, p. 7 (La. 2/6/98), 708 So.2d 731, 735; North American Specialty Ins. Co. v. Employers Reinsurance Corp., 02-2649, p. 3 (La.App. 1 Cir. 9/26/03), 857 So.2d 606, 609, writ denied, 03-2977 (La. 1/16/04), 864 So.2d 633. If, however, the trial court does make an error of law, but such error does not interdict the fact finding process, de novo review is not warranted. C.R.W. v. State, Dept. of Social Services, 05-1044, p. 11 (La.App. 1 Cir. 9/1/06), 943 So.2d 471, 482, writ denied, 06-2386 (La. 12/21/06), 944 So.2d 1289.
Furthermore, the party alleging error has the burden of showing the error was prejudicial to its case. This requires proof that the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. L & A Contracting Co., Inc. v. Ram Indus. Coatings, Inc., 99-0354, p. 19 (La.App. 1 Cir. 6/23/00), 762 So.2d 1223, 1234, writ denied, 00-2232 (La. 11/13/00), 775 So.2d 438.
In the case sub judice, the trial court ruled that the parties were bound by the language of the pre-trial order and denied the motion to amend it. Clearly, this was not an abuse of discretion by the trial court. However, the trial court then allowed the defendants to deviate from the established facts contained in the pre-trial order throughout the trial of this matter. The subsequent rulings of the trial court put the issue of the occurrence of the accident squarely before the jury and amounted to legal error, unduly prejudicing Millican. While each action of the trial court standing alone might have been harmless error, we cannot say, when looking at the entire record, that plaintiff was not prejudiced by the rulings of the trial court. In other words, we believe that these errors interdicted the fact finding process and had a substantial effect on the outcome of the case.
On the day of trial, Millican's attorney was prepared to go forward under the valid assumption that he did not have to prove that an accident occurred. He structured the preparation and presentation of his case around this already established fact. Because the fact that an accident occurred was agreed upon by the parties from very early on in this matter, it was not necessary for the plaintiff to depose Womack or the thirty or so children on the school bus to establish this fact.[7] Nor did he find it necessary to take the deposition of the state trooper who wrote the motor vehicle accident report to establish the fact of the accident.[8] Reconstruction experts were not deposed or called to testify, the occurrence of the accident having already been stipulated to as an established fact. In essence, there was no need for discovery to establish the occurrence of an accident. Yet, as a result of the court's rulings and deviation from the pre-trial order, Millican was required to establish at trial a fact that had already been established prior to trial. The primary defense of the defendants, as allowed by the trial court, became the defense that an accident never occurred and was the equivalent of trial by ambush. We conclude that the accumulation of the actions of the trial court resulted in manifest injustice and prejudice to the plaintiff.
The defendants argue, however, that the trial court did not err in its rulings, because the pre-trial order specifically reserved as contested all facts implicit in a determination of liability, and the defendants never stipulated as to liability. We agree that the defendants never stipulated as to liability; however, they did agree to the fact that an accident occurred. Millican never argued that the parties had stipulated as to liability or causation, despite the defendants' repeated arguments that Millican stated such. The fact that an accident occurred does not equate to liability, nor does it in any way establish that the injuries were causally related to the accident. This argument is without merit. The defendants further assert that the pre-trial order was ambiguous in that it stated: "Defendants contend that all issues of fact and law are contested." The pre-trial order clearly established the fact that an accident occurred and the boilerplate phrase relied upon by the defendants does not override this specific stipulation of fact. This argument is also without merit. Consequently, the issue of whether an accident occurred should never have been put before the jury, as it was clearly prejudicial under the facts and circumstances of this case and interdicted the fact finding process. Accordingly, we conclude that the trial court made an error of law, which requires this court to make a de novo review of the record. Therefore, we vacate the judgment of the trial court. Because the record before us is complete, we will review the record and render judgment. Evans, 97-0541, 97-0577 at p. 7, 708 So.2d at 735.

Causation
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La. 1991); Breitenbach v. Stroud, 06-0918, p. 17 (La.App. 1 Cir. 2/9/07), 959 So.2d 926, 938. The plaintiff must prove causation by a preponderance of the evidence. The test for determining the causal relationship between the accident and subsequent injuries is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Breitenbach, 06-0918 at pp. 17-18, 959 So.2d at 938.
Millican was twenty-six years old on the date of the accident. He testified that he was on his way to his afternoon job when he encountered the overturned log truck and came to a stop on Greenwell Springs Road. The school bus stopped behind him. Thereafter, the bus pulled up next to him; the driver opened the door and asked Millican if he would mind backing up so she could pull into an adjoining driveway to turn the bus around. Millican said he would do so and backed up his truck. Millican stated that when the bus began pulling out of the driveway, he saw that the bus was going to hit the left front of his vehicle. He testified that when he turned to look behind him and put the standard transmission of his truck in reverse, the accident occurred. Millican testified that when the bus hit his truck, the impact turned him around, his legs slammed together, and he hit his head and shoulder on the door and window. The impact jerked the truck, knocking out the blinker and the headlight assembly. However, Millican admitted that it was a low impact collision. His pickup was drivable and Millican continued on to his afternoon job at the woodworking shop after a police report was prepared. However, because of the pain in his back, Millican stated that he was unable to remain at work that day. Two days later, Millican went to the emergency room, complaining of pain in his neck, back, and left shoulder as a result of the accident. What followed was a lengthy course of conservative treatment, which proved unsuccessful. Millican testified he did not want to undergo spinal surgery, but faced with chronic pain, and because he began to suffer some loss of bladder and bowel control, he ultimately underwent artificial disc replacement surgery on January 13, 2005.[9] Millican testified that prior to this accident he had no complaints of back pain, had never been to an orthopedist for his back, and had never been told he had a bad back.[10]
Dr. John Michael Burdine, one of Millican's treating physicians and a pain management expert, testified by deposition. Dr. Burdine testified that the MRI taken of Millican's lumbar spine on March 3, 2003, indicated annular tears at the L4-L5 and L5-S1 levels and that Millican's complaints of pain were consistent with these findings. Dr. Burdine stated that twisting and bending, such as what Millican was doing when he turned backwards to back up his truck and was hit, creates a sheer force, putting maximum pressure on the front corners of the disc, which can cause it to tear or extrude. He testified that ninety to ninety-eight percent of tears that he sees in patients less than forty years of age are trauma related. Dr. Burdine concluded that given the history as provided by Millican, the accident was the cause of the tears experienced by Millican.
Upon Millican's referral to Dr. Burdine in June 2003, Dr. Burdine was not surprised that there had been little improvement with Millican's previous conservative therapy, since annular tears are extremely resistant to treatment.[11] As his treating physician, Dr. Burdine initially tried a series of epidural steroid shots in an attempt to resolve some of Millican's pain, but he discontinued the series after two injections, rather than completing the usual set of three, as the shots failed to alleviate Millican's pain. Thereafter, on September 25, 2003, Dr. Burdine performed a discogram, using dye and a pressure gauge, to get an accurate determination of Millican's pain perspective. The test confirmed that the right annular tears in the two discs were causing plaintiffs pain, as Millican had described it.
On November 18, 2003, Dr. Burdine tried an IDET (intradiscal electrothermoplasty) procedure in an attempt to mend the tears. In the IDET procedure, a needle is placed into the disc, a wire is threaded through the needle that circles the disc next to the tear, and high heat is used to try to weld or seal the tear. Testifying that it takes approximately six months to determine if the procedure is successful, Dr. Burdine ultimately concluded that there was no long term effect on Millican. Dr. Burdine thereafter referred Millican to Dr. Jorge Isaza for surgery, having exhausted all conservative treatment available.
Dr. Jorge Isaza testified by deposition as an expert in the field of orthopedic surgery. He stated that he was one of only ten orthopedic surgeons in the United States originally approved by the Food and Drug Administration (FDA) to perform artificial disc replacement surgery. He described the surgery performed and stated that while the surgery was technically successful, Millican was still in a lot of pain, taking a lot of medication, and he had not returned to any type of activity. It was Dr. Isaza's opinion that the accident started Millican's symptoms, based on the history Millican gave to him. He stated that it was rare that a twenty-six year old would injure his spine without some form of trauma.
Dr. Charles Greeson, Millican's expert in the field of radiology and neuroradiology, reviewed Millican's x-rays and MRI scans. Also testifying by deposition, Dr. Greeson stated that although the trauma from a twisting motion could cause a tear in a disc, it would simply be conjecture for him to say to what degree the tears were caused by the accident.
Dr. Allen Joseph testified by video deposition. Defendants' expert in the field of neurosurgery, Dr. Joseph reviewed Millican's MRI scan of March 2003, which, according to Dr. Joseph, revealed degenerative changes in the lower lumbar spine. Dr. Joseph also identified disc desiccation and some disc bulging along with wear and tear changes on the margins of the bone associated with bone spurring at the L4-L5 and L5-S1 levels. He stated that these changes typically occur over years. Based on Millican's history to him, including the minor damage to the vehicle and the fact that Millican did not seek immediate medical help, Dr. Joseph suggested that the accident did not transmit much energy into his body. The overwhelming medical probability was that Millican had disease in his back long before the accident. Dr. Joseph admitted, however, that it was a "reasonable assumption" that the accident pushed Millican into a symptomatic state. It was Dr. Joseph's opinion that Millican would be able to perform only sedentary or light type duty work, such as a telemarketer.
Dr. Curtis Partington, defendants' expert in the field of neuroradiology and diagnostic radiology, also testified by deposition. Dr. Partington reviewed Millican's x-rays and MRIs. According to Dr. Partington, the x-ray films showed osteophytes, or bone spurs, which grow to strengthen weak discs and which take years to form. Thus, Dr. Partington was of the opinion that the osteophytes could not have formed between the October 28, 2002 accident and November 12, 2002 (the date of the x-ray). However, Dr. Partington stated that, although unlikely, the narrowing and bulging of the disc could have occurred between October 28, 2002, and November 12, 2002. According to Dr. Partington, the osteophytes and disc bulging more likely indicated a chronic process that had been going on for years. The films showed the chronic disc bulging, but Dr. Partington had no idea as to its causation. Dr. Partington further testified that the MRIs showed significant disc desiccation at both levels. It was Dr. Partington's opinion that the osteophytes and disc desiccation were not related to the accident. However, he could not say that the herniations did not get worse with the accident, but found no evidence of that. According to Dr. Partington, it generally takes significant trauma and significant motor vehicle damage to cause enough stress to injure the back.
The medical testimony indicates that Millican had preexisting degenerative disc disease. However, the evidence also shows that any back problems were asymptomatic until the accident at issue herein. The evidence presented established no history of back complaints prior to the accident. After a review of the evidence, we determine that Millican proved that it is more probable than not that the October 28, 2002 accident aggravated an asymptomatic preexisting back condition, which resulted in Millican's disability.

Damages
Having established that Millican met his burden of proving that his injuries were causally related to the accident herein, it is now necessary to make a determination as to damages that are appropriate under the circumstances herein. The types of damages awarded in a personal injury action consist of general and special damages. General damages are speculative in nature and, thus, incapable of being fixed with any mathematical certainty. They include pain and suffering, physical impairment and disability, and loss of enjoyment of life. McGee v. A C and S, Inc., 05-1036, pp. 3-4 (La. 7/10/06), 933 So.2d 770, 774. The primary objective of general damages is to restore the injured party in as near a fashion as possible to the state he or she was in at the time immediately preceding injury. Factors to be considered in assessing quantum for pain and suffering are the severity and duration thereof. Turner v. Ostrowe, 01-1935, pp. 15-16 (La.App. 1 Cir. 9/27/02), 828 So.2d 1212, 1224, writ denied, 02-2940 (La. 2/7/03), 836 So.2d 107.
Furthermore, it is well settled in our jurisprudence that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Where defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of his aggravation. American Motorist Ins. Co., 579 So.2d at 433; Reck v. Stevens, 373 So.2d 498, 502 (La. 1979).
Where a fact finder does not reach an issue because of an earlier finding which disposes of the case, the court of appeal, in vacating the earlier finding, must make a de novo determination of the undecided issues from the facts in the record. The reviewing court must make an award that is just and fair for the damages revealed by the record, where the jury has made no award for damages. LeBlanc v. Stevenson, 00-0157, p. 6 (La. 10/17/00), 770 So.2d 766, 771-72. Thus, we must conduct a de novo review of the record to ascertain damages.
Millican was twenty-six years old on the date of the accident. He had a tenth-grade education, but thereafter obtained his GED. At trial, he testified regarding his work history, which consisted primarily of working as a cook. At Macaroni Grill he was a sauté chef, which required a lot of moving and lifting of heavy saute pans.[12] Millican testified that prior to the accident, he lived on his own, in an apartment. However, when the decision was made to undergo surgery, he moved in with his mother so she could help him with his recovery. He stated that since the surgery, his pain is less intense, but that he is still in constant pain and is on medication for the pain. He testified that although he tries to do as much as possible, he is limited to minor activities, such as cooking, washing dishes, and grocery shopping. He also has trouble sleeping. Millican stated that he is unable to sit for long periods of time and is in fear of what the future holds for him, especially his work future.
Dr. Isaza testified that every possible conservative treatment for Millican was attempted in order to avoid spinal surgery, but it was his opinion that surgery became necessary. Previously, fusion of the two discs would have been Millican's only option, but in November 2004, the FDA approved artificial disc replacement surgery for those with discogenic pain, which is that caused by a lesion in a disc. Dr. Isaza testified that artificial disc replacement surgery, as opposed to a disc fusion, allows for a faster recovery with greater mobility. At the time of Millican's surgery, artificial disc replacement was through the stomach, and required the use of a "piling driver" to put the artificial replacement discs in place. Dr. Isaza testified that it would take more than a year for Millican to reach his maximum medical improvement, including decreasing his pain medication, and that he was still disabled.
Considering all of the evidence, including the testimony of the doctors, Millican's own testimony, the type of surgery, and the extent of the surgery at two disc levels, we are of the opinion that the record in this case supports a general damage award of $225,000.
Special damages are those which have a "ready market value," such that the amount of the damages theoretically may be determined with relative certainty, including medical expenses and lost wages. Kaiser v. Hardin, 06-2092, p. 11 (La. 4/11/07), 953 So.2d 802, 810. Millican introduced documentary evidence that he incurred expenses totaling $144,533.85 for his medical treatment, including the surgery, following the accident. This amount was not contradicted and we award that amount.
With regard to a loss of past and future wages, Lamar Jones, Ph.D., testified at trial as Millican's expert economist. Dr. Jones testified that he reviewed Millican's tax returns for the years 1998 through 2002.[13] Dr. Jones was of the opinion that Millican suffered a loss of past wages in the amount of $42,203. Dr. Jones testified that he reached this amount by simply using Millican's highest wages for the year before his injury ($13,993) and multiplying by three (the number of years between the date of the accident and the date of trial).[14]
Defendants argue, however, that because in 2001, the last full year before the date of the accident, Millican earned wages in the amount of $8,930, the $8,930 amount should have been used, rather than the $13,993 amount Millican earned in 2000. While Dr. Jones did not concede that the $8930 amount should have been used, he recognized the error in the information given to him regarding the date of the accident (he was initially told the accident was in 2001, and therefore used 2000 as the last full year of employment by Millican). After the error was pointed out to Dr. Jones, he suggested averaging the two years. We agree. Accordingly, we will average Millican's wages for the two years prior to the accident ($11,461.50) and award Millican $34,384.50 in past lost wages for the three-year period.
With regard to Millican's future employment, Dr. Isaza testified that Millican had not yet reached maximum medical improvement (MMI) following his surgery, stating that would take approximately one year. Once Millican reaches MMI status, Dr. Isaza testified that it would then be necessary to reduce Millican's pain medications. Dr. Isaza was of the opinion that Millican would be limited to light or sedentary jobs in the future.
Stephanie Chalfin, the vocational rehabilitation specialist, testified at trial. It was her opinion that Millican, while disabled, will be employable at a light or sedentary work status once he reaches MMI status. Millican's past job experiences, as described to her, exceeded medium work status. She did not believe that Millican would ever be able to return to his primary job as a cook.[15] Furthermore, Chaffin believed that Millican will need vocational rehabilitation assistance in order to be employable, including training for the disabled from four months to a year, before job placement. Additionally, Chalfin testified that Millican needed to wean off of his medications.
Chalfin further testified that because of Millican's young age, he had not had the opportunity to reach his earning potential. Typically, young workers have gaps in employment and an unsteady work history. Therefore, tax returns of a younger worker do not always address what that person's future earnings will be. Because Millican was twenty-six at the time of the accident, he was classified as a younger worker. It was Chalfin's opinion, however, that Millican had a diminished earning capacity because of this accident.
In computing future lost wages, Dr. Jones used 28.4 years of remaining work life expectancy for someone of Millican's age.[16] He then took Millican's highest wage year before the accident of $13,993, multiplied it by 28.4 years, and determined a net present value of $317,971 in future lost wages. Then, assuming that Millican could work a forty-hour per week minimum wage job, Dr. Jones reduced the amount of future lost wages by what Millican would make at a forty-hour per week minimum wage job, or $234,057, leaving a difference of $83,914 in future lost wages. Thereafter, Dr. Jones made an alternative computation using the $10.25 per hour amount (the amount per hour that Millican was making at Macaroni Grill on the date of the accident), rather than minimum wage. Dr. Jones testified that the net present value of a forty-hour per week job at $10.25 per hour for 28.4 years was $484,476. Deducting what Millican would make at a forty-hour per week minimum wage job ($234,057), the difference resulted in $250,419 in future lost wages. Defendants did not call an economist to contradict this testimony.
Based on the record before us, including Millican's employment and earning history, we determine that the amount of $83,914 in future lost wages is reasonably supported by the record, and we award that amount.

CONCLUSION
For the reasons set forth herein, we vacate the judgment of the trial court. After a de novo review, we hereby render judgment against the named defendants and in favor of the plaintiff, Daniel E. Millican, and award general damages in the amount of $225,000 and special damages in the amount of $144,533.85 for medical expenses, $34,384.50 in past lost wages, and $83,914 for future lost wages. Further, we render judgment assessing appeal costs in the amount of $2,483.30 against the East Baton Rouge Parish School Board, Virginia B. Womack, and Coregis Insurance Company.
VACATED AND RENDERED.
NOTES
[1] Coregis Insurance Company afforded liability coverage to the East Baton Rouge Parish School Board.
[2] At the time of the accident, Millican was twenty-six years old and was working as a sauté cook at Macaroni Grill and was also working part-time at a woodworking shop. He was on his way from his job as a cook to his afternoon job at the woodworking shop when the accident occurred.
[3] The jury trial was held before the Honorable Leon Cannizzaro, Jr., sitting as judge ad hoc for the Honorable Wilson Fields.
[4] The record also contains a copy of the same judgment signed on November 21, 2005. However, it was the November 28, 2005 signed judgment that was mailed by the court to the parties.
[5] The verdict form actually submitted to the jury had as its first question: "Do you find that Daniel Millican was injured in an accident which is the subject matter of this lawsuit?" Plaintiff originally requested that the first question of the verdict form refer to "the accident." (Emphasis added.)
[6] Specifically, counsel referred to LSA-C.C.P. art. 1551, which will be discussed subsequently herein.
[7] Although the closing arguments of counsel are not part of the record and therefore not part of our determination, Millican also notes in his reply brief to this court that in his closing argument to the jury, the defendants' counsel was permitted to state that plaintiff should have taken the depositions of the school bus driver and its passengers to determine if an accident had happened.
[8] This became particularly important at trial, since the officer was unavailable, having been deployed to Iraq.
[9] Millican had to wait approximately six months for FDA approval for the surgery, as it was the first of its kind in Louisiana.
[10] Millican did testify that he was treated by a chiropractor for a tailbone injury when he was sixteen years old. The medical history Millican gave to his orthopedist, Dr. F. Allen Johnston, on November 12, 2002, indicated that Millican "went to Dr. Plantz (chiro) when he was 16 y.o. after a fall that bruised his tailbone. Within a few weeks he was asymptomatic." No further information regarding this incident is provided in the record.
[11] Millican's earlier treatment included pain medication, injections, and physical therapy. It also included twenty-four VAX-D stretching treatments with Dr. Billy A. May of the Family Clinic in Baton Rouge.
[12] Millican testified that he had been working for Macaroni Grill for a year and a half when he moved to Alabama to work with his father. He testified that he moved back after a year and had been working for Macaroni Grill for two months when the accident occurred.
[13] According to his tax returns, Millican earned $10,253 in 1998, $3,321 in 1999, $13,993 in 2000, and $8,930 in 2001.
[14] Based on a forty-hour work week at $1015 per hour, which was Millican's rate of pay on the date of the accident, Dr. Jones also offered the amount of $64,310 (or $21,320 per year for the three years) as an alternative amount for past lost wages.
[15] Chalfin testified that when Millican was working as a chef, he earned between nine and ten dollars an hour.
[16] Dr. Jones testified that he used the United States Department of Labor statistical work-life expectancy tables in determining Millican's work-life expectancy.